1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
    Case No. 16-cv-00432-MEH
 3  _____

 4  SANTIAGO ABREU,

 5       Plaintiff,

 6  vs.

 7  TAVIN FOODS, INC.,

 8       Defendant.
    _____
 9

10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 10:32 a.m., October 4,

13  2016, in the United States Courthouse, Denver, Colorado.

14  _____

15          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                        APPEARANCES

19          BRETT HUFF, Attorney at Law, appearing for the

20  Plaintiff.

21          COURTENAY PATTERSON, Attorney at Law, appearing

22  for the Defendant.

23  _____

24                   SCHEDULING CONFERENCE

25
```

```
1                P R O C E E D I N G S
2             (Whereupon, the within electronically recorded
3   proceedings are herein transcribed, pursuant to order of
4   counsel.)
5             THE COURT:  Case Number 16-cv-00432, Santiago -- I
6   keep saying Abreu, but I think you pronounce it differently.
7             MR. HUFF:  It's Abreu.
8             THE COURT:  It's Abreu?
9             MR. HUFF:  Yes, Your Honor.
10            THE COURT:  Okay.  -- vs. Tavin Foods, doing
11  business as Riverbend Market and Eatery.  Appearances,
12  please.
13            MR. HUFF:  Your Honor, on behalf of Santiago Abreu,
14  the plaintiff, Brett Huff.
15            THE COURT:  Thank you, good morning.
16            MS. PATTERSON:  Good morning.  Courtenay Patterson
17  representing Tavin Foods.
18            THE COURT:  Good morning.  Now, I think, did I have
19  Tavin Foods here when he was pro se?
20            MR. HUFF:  Yes, you did, Your Honor.
21            THE COURT:  Okay, okay, good.  I thought I
22  remembered that.  Are you following the legislation that is
23  potentially going through Congress?
24            MR. HUFF:  Yes, Your Honor.
25            THE COURT:  What stage is that?
```

```
 1            MR. HUFF:  I'm not sure, Your Honor, where they're
 2   at procedurally with that.  I know it's out there.  I know
 3   they're --
 4            THE COURT:  Do you know what we're talking about?
 5            MS. PATTERSON:  Yes, Your Honor, I do, I've been
 6   following it.  I looked at it about a week ago and I also
 7   don't recall exactly where it was, but it's -- it is making
 8   its way through.
 9            THE COURT:  I don't know if they're doing anything
10   besides politicking between now and the end of the year, but
11   I had just read something about that in the paper.
12            Is this the -- is this the -- the one that made the
13   news article?  It was?  Okay.
14            Okay, so we have on page 4 -- I don't know how
15   yours paginated out, but it was 6 -- paragraph 6(c) with
16   regard to 21(a)(1)s.  We only have the plaintiff's statement
17   there.  Did you -- Ms. Patterson, do you have an idea about
18   when you would be making yours?
19            MS. PATTERSON:  I can make mine shortly thereafter.
20   Whatever --
21            THE COURT:  Okay.
22            MS. PATTERSON:  However it pleases the Court is
23   fine, I should be able to do that.
24            THE COURT:  Do you want to do seven days later?
25   25th?
```

```
 1            MS. PATTERSON:  Could I have 14 days?  We're in the
 2   process of obtaining an expert to come in and do a review of
 3   the premises and do some of that initial work.
 4            THE COURT:  Okay.
 5            MS. PATTERSON:  Calls have been made, but if I
 6   could have 14 days, that would be --
 7            THE COURT:  Any objection, Mr. Huff?
 8            MR. HUFF:  No, Your Honor.
 9            THE COURT:  That will be November 1.  So how long
10   have you had your own practice?  You don't have to keep
11   rising.
12            MS. PATTERSON:  Honestly, I started it in January.
13   I only took the Bar last summer out here.
14            THE COURT:  Oh, did you.
15            MS. PATTERSON:  I practiced in California for 12
16   years.
17            THE COURT:  Okay.
18            MS. PATTERSON:  Moved out here and just waited a
19   couple years before I decided to actually take the Bar.  So
20   it's a fledgling practice.
21            THE COURT:  Longmont is beautiful.
22            MS. PATTERSON:  We do love it up there.
23            THE COURT:  I do too.  I wish I could live there.
24   What I do is down here and it would be a little bit of a
25   drive, but if I retire, I think I would like that
```

```
 1   Longmont/Loveland area and Berthoud, you know, that area up
 2   there.
 3            MS. PATTERSON:  Berthoud was actually where we were
 4   hoping to land and we just couldn't find the right property,
 5   but we're pretty happy in Longmont, so . . .
 6            THE COURT:  Are you?  Do you have a piece of
 7   property?
 8            MS. PATTERSON:  We do.  We have an acre, but we
 9   back up to about 200 acres of open space.
10            THE COURT:  Oh, my gosh.
11            MS. PATTERSON:  So it's in direct view of Pikes
12   Peak -- or of Longs Peak, excuse me, so it's pretty nice.
13            THE COURT:  So probably in these cases don't you
14   think very limited discovery is necessary?  And it's mostly
15   just a matter of mechanics, isn't it?
16            MR. HUFF:  It is, Your Honor.  There is essentially
17   testimony of experts is what it's going to boil down to.
18            THE COURT:  Right.
19            MR. HUFF:  An expert on each side probably and then
20   the parties.
21            THE COURT:  So educate me.  Are there any -- are
22   there any grandfathering sort of provisions or time to ramp
23   up?  Was there a time to ramp up when the ADA was first
24   passed?
25            MR. HUFF:  Yeah, the ADA was passed 26 years ago,
```

1  Your Honor.

2          THE COURT:  Right.

3          MR. HUFF:  And there was -- in initial stages there

4  was a few year period of time for smaller businesses, and

5  they had -- they had an extended period of time.  I can't

6  remember what it was, Judge.  It was a few -- it was a few

7  more years before they had to come into compliance.

8          THE COURT:  But now, I mean, the law is full on,

9  there is no exceptions sort of thing?

10         MR. HUFF:  Right.  If you're public accommodation,

11 it doesn't matter how big your business is.  It has to be

12 compliant with the ADA.

13         THE COURT:  Would a church be a public

14 accommodation?

15         MR. HUFF:  Your Honor, I haven't looked at that

16 issue.  I do know that governmental entities are required

17 to -- to comply with the ADA.

18         THE COURT:  What are?

19         MR. HUFF:  Public accommodations are --

20         THE COURT:  No, no, you said, who was required to

21 apply?

22         MR. HUFF:  Governmental entities.

23         THE COURT:  Oh, governmental entities, sure.

24         MR. HUFF:  Not that I've taken one on.

25         THE COURT:  Right, but it -- under the fed, it

1    would be the Rehab Act instead of the ADA or are they subject

2    to the ADA?

3            MR. HUFF:  No, they're subject to the ADA too, yes.

4            MS. PATTERSON:  Although, my understanding in terms

5    of the grandfathering, it's not grandfathering, per se, but

6    that depending on when the building was constructed and

7    depending on -- it either has to comply with one set of rules

8    from the ADA or the more recent 2010 set of rules, and also

9    if there has been a substantial renovation of the premises,

10   then even if it was an older building that didn't have to

11   comply with the 2010, if it's undergone this, then it would

12   have to comply with that.

13           THE COURT:  Does that sound like --

14           MR. HUFF:  That's absolutely right.

15           THE COURT:  Well, that's the way it is with

16   building codes.  So my house -- I didn't have my electrical

17   box on the outside of the house, but the first time I ever

18   made any -- pulled a permit of any kind they're going to make

19   me update the electrical to code, so we had to put a box on

20   the outside.

21           MR. HUFF:  So you live in an older house, Judge?

22           THE COURT:  Yeah.  So 1970 it was built.  It's old,

23   but it's not a classic, unfortunately.

24           MR. HUFF:  Well, I have a classic and they take a

25   lot of work.  I've got a 1941 Tudor that --

```
 1            THE COURT:  The plumbing probably is the problem
 2   more than --
 3            MR. HUFF:  Yeah, they have those old clay --
 4            THE COURT:  Yeah.
 5            MR. HUFF:  And you've got to have drilled out a
 6   couple times a year because the trees grow in them.
 7            THE COURT:  Oh, so your drain?
 8            MR. HUFF:  Yeah, the drain.
 9            THE COURT:  And that's not cheap.
10            MR. HUFF:  Well, it's about a hundred bucks a shot.
11   Then when I first moved into the house, I had all of the
12   galvanized lines taken out and copper lines put in.
13            THE COURT:  Okay.
14            MR. HUFF:  Took care of that right away.
15            MS. PATTERSON:  I would say I would imagine the
16   wiring would be a little bit of a process to bring that up.
17            MR. HUFF:  Yeah, and expensive for sure.
18            THE COURT:  Well, where I grew up, 1941 is not an
19   old house.
20            MS. PATTERSON:  Now, Your Honor, to be clear, and I
21   believe that Mr. Huff already knows this too.  So my client
22   did undergo a substantial renovation.  So at the time when he
23   did do that, his -- his restaurant was compliant with city --
24   with local and county codes and --
25            THE COURT:  Which probably don't include this sort
```

```
 1   of element.
 2             MS. PATTERSON:  Which may not include that, but
 3   according to the architect who did do the plans and the
 4   building, or (inaudible) building, everything was 100 percent
 5   ADA compliant at the time.  So this is why we're working to
 6   get an expert to come in and --
 7             THE COURT:  Now, that raises an interesting
 8   question.  So would one have a professional malpractice claim
 9   against an architect that failed to design --
10             MS. PATTERSON:  Well, it's funny you bring that up,
11   because that was the first thing that went through my mind,
12   not that I'm looking for a lawsuit.
13             THE COURT:  No, of course, but --
14             MS. PATTERSON:  No, it is.  I mean, it's something
15   that crossed my mind.
16             THE COURT:  You pay a person money to give you a
17   building that's good to go, you would expect that they're --
18   you're hiring them for their expertise.
19             MS. PATTERSON:  Well, and it was part of my
20   client's confusion when he first got contacted, because he
21   said, I just made these renovations in the last two years and
22   everything is up to code, not just from the county
23   standpoint, but also from -- you know, what the architect
24   told him.  So he -- he was shocked to hear it.  He has since
25   spoken with the architect who said, No, it absolutely was up
```

1  to code.  And again, this is where we're, you know, trying to
2  get some information out of it.  But, yes, that was the first
3  thing that went through my mind.
4            THE COURT:  Well, a tape measure, I guess, is the
5  most important thing you need with this kind of a case,
6  right?
7            MR. HUFF:  It's pretty objective.
8            THE COURT:  Okay, I'm just going to change some
9  years here in paragraph 9(d)(4).  That will be January of
10 2017.  And then everything else looks wonderful.  Good job.
11 I'll go ahead and set a final pretrial conference date.  We
12 do that 60 days from dispositive motion.  It seems like this
13 would usually be sort of a case that would be -- if it gets
14 to that stage, that would be amenable to a motion, wouldn't
15 it?
16           MR. HUFF:  Yes, Your Honor.
17           THE COURT:  Would you agree?
18           MS. PATTERSON:  I would agree.
19           THE COURT:  Okay.  So we'll set one anyway, though.
20 It will be June.  Let's just say June -- June 12 at 11:00 if
21 you're available.
22           MS. PATTERSON:  I'm available.  Thank you.
23           MR. HUFF:  I'm available too, Your Honor.  Thank
24 you.
25           THE COURT:  And then we -- I do ask that before

```
 1   there is a motion concerning discovery filed, that we all get
 2   together and talk about it beforehand, okay.  And --
 3              MS. PATTERSON:  And I'm sure Your Honor is aware,
 4   counsel is aware, that I did file a motion to dismiss in this
 5   matter.
 6              THE COURT:  On the 1st?
 7              MS. PATTERSON:  Yes.
 8              THE COURT:  Which was --
 9              MS. PATTERSON:  Only a couple days ago.  I realize
10   I just --
11              THE COURT:  Was that Saturday?
12              MS. PATTERSON:  I actually thought I did it on
13   Friday, but with the week I was having, it very well could
14   have been on Saturday.
15              THE COURT:  That's a note I have, it was Saturday.
16              MS. PATTERSON:  Okay, I apologize.  It certainly
17   was my intention to have it done Friday at the latest.
18              THE COURT:  No.  It's not like I was sitting around
19   on Saturday and it came in, but, yeah, it is dated October 1.
20   So I was actually on the committee for CM/ECF when it was set
21   up back in '05.  Do you remember Judge Nottingham?
22              MR. HUFF:  Oh, yes.
23              THE COURT:  So he chaired the committee and I was
24   at the U.S. Attorney's Office and so we debated what to do
25   with regard to any deadline.  So do we make it 5 o'clock?  Do
```

1  we go to midnight?  Do we go 24/7?  And I guess we probably

2  had the presence of mind to say let's just go 24/7.  So now

3  you can file anything any time you want, right?  I guess you

4  can.

5          MS. PATTERSON:  Apparently.  Like I said, I thought

6  I did it on Friday, but I guess I did do it on Saturday.

7          THE COURT:  That's at least when it was docketed.

8          MS. PATTERSON:  All this filing on line is -- it

9  takes a little getting used to, I'm sure.  I'm sure the

10 judges had, you know, some time -- it took some time to get

11 used to it, but I was out of practice for a few years and

12 everything went electronic in between when I stopped

13 practicing --

14         THE COURT:  Right.

15         MS. PATTERSON:  -- and when I started again.  So

16 this has been a big adjustment.

17         THE COURT:  So have you ever heard of our Judge

18 Matsch?

19         MS. PATTERSON:  Uh-huh.

20         THE COURT:  And have you been in front of Judge

21 Matsch?

22         MR. HUFF:  Oh, yes.

23         THE COURT:  When this system was just coming

24 online, there was an attorney who was trying to show an

25 associate partner, was showing an associate how to file

```
 1   something and he created this goofy irreverent sort of

 2   document just for fun and says, Here is how you would file

 3   it, and he filed it in a Matsch case.

 4            We've actually had -- we've had people do silly

 5   things.  I don't know how it ended up, but we had people file

 6   menu restaurant -- restaurant menus on CM/ECF, just suddenly

 7   their -- a menu appears on the docket.  So you've got to be

 8   careful when you're going to press that button, because it's

 9   irretrievable, and we don't strike anything any more either.

10   It's not like it will ever disappear.  Anything that's filed

11   stays forever.

12            Now, you could have a motion and an order later

13   saying that that's stricken or whatever, but it doesn't go

14   away; it just means it has no effect.

15            All right, anything else, Mr. Huff?

16            MR. HUFF:  No, Your Honor, thank you.

17            THE COURT:  Okay.  Ms. Patterson?

18            MS. PATTERSON:  No, Your Honor.

19            THE COURT:  Okay, thank you, you guys.  Have a

20   great rest of the week, okay?

21            (Whereupon, the within hearing was then in

22   conclusion at 10:46 a.m.)

23

24

25
```

```
1                    TRANSCRIBER'S CERTIFICATION
2    I certify that the foregoing is a correct transcript to the
3    best of my ability to hear and understand the audio recording
4    and based on the quality of the audio recording from the
5    above-entitled matter.
6
7    /s/ Dyann Labo                      July 5, 2021
8    Signature of Transcriber            Date
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```